UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles N. MATTHEWS,
Defendant-Appellant.

No. 78–1423.

United States Court of Appeals,
Tenth Circuit.

Feb. 29, 1980.

Nancy E. Rice, Asst. U. S. Atty., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., was on brief), for plaintiff-appellee.

Michael G. Katz, Asst. Federal Public Defender, Denver, Colo. (Daniel J. Sears, Fed-

eral Public Defender, Denver, Colo., was on brief), for defendant-appellant.

Before HOLLOWAY, BREITENSTEIN and DOYLE, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant Charles Nathaniel Matthews brings a timely appeal of his conviction and sentence[1] under the Dyer Act, 18 U.S.C. § 2312.[2] Trial was had to a jury on March 22, 1978, on a one-count indictment stating that on or about January 31, 1978, the defendant

did unlawfully, knowingly, and willfully transport in interstate commerce a motor vehicle, knowing the same to be stolen, to wit: a 1970 Ford belonging to and stolen from Dick Strauss Ford in Richmond, Virginia, on January 21, 1978, all in violation of Title 18, United States Code, Section 2312.

Because sufficiency of the evidence is not an issue only a brief summary of the evidence need be given at this point. The evidence showed that defendant was present on the grounds of Fitzsimmons Army Medical Center in Aurora, Colorado, on January 31, 1978. A car which defendant identified as his raised the suspicion of various military officers because it was a civilian car, a 1970 Ford, bearing military license plates. Military cars, the only cars which should legally bear military license plates, are painted distinctive colors. The only military cars not painted distinctive colors are those used by various military investigative units, but these cars use the license plates of the state in which they are used.

In response to a request for identification and information about the ownership of the car, the defendant produced an automobile registration form for a Chevrolet, explaining that such a form was interchangeable with a form for a Ford. Shortly after this, the defendant and the car were taken into custody. The defendant was questioned by various military law enforcement agents and the car was searched.

Defendant was released by military officers after some 10 hours. Shortly thereafter he was stopped by an officer of the Aurora Police Department because of suspicions relayed to the department by the military police; he was subsequently arrested after the police department had received information from an NCIC (National Crime Information Center) computer check that the car had been stolen earlier in Richmond, Virginia. The Aurora Police Department then notified the FBI which proceeded to investigate the incident for a possible Dyer Act violation.

Defendant gave various accounts of how he came into possession of the car and the military license plate, saying that he had the military plate because he was a special agent for the Marine Corps and later stating to an FBI agent that his brother-in-law was "Chief of Staff" and had arranged for the military plate. The license was subsequently determined to belong to the Colorado National Guard. Defendant also said that he had borrowed the car from a car dealer in North Carolina and later told the FBI agent that he bought it from a car dealership in Richmond, Virginia.

Prior to trial defendant moved to suppress "all property seized as a result of an unlawful search of a vehicle used by the defendant at the time of his arrest by local and military law officers," and to suppress "from use in evidence in this case the results of the search, [and] the interrogation of the defendant." (I R. 2–3). An evidentiary hearing was held on the motion and at the time the defendant specified exactly what evidence he wanted to suppress. This included "[a]nything that was within the

---

1. Following the verdict, defendant was sentenced to five years' imprisonment.

2. 18 U.S.C. § 2312 provides:
 Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, know-

ing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

automobile or on the person of Mr. Matthews." (II R. 97).

The motion to suppress was denied and defendant's trial and conviction followed. On appeal defendant argues that the trial court erred (1) in ruling that defendant did not have standing to challenge the search of the car; (2) in holding that defendant was lawfully arrested by the military police; and (3) in upholding the searches of the car and defendant's person and in refusing to suppress tangible evidence and statements said to have been obtained in violation of his Fourth Amendment rights.

## I

At the hearing on the motion to suppress, the trial judge *sua sponte* raised the question of defendant's standing to challenge the lawfulness of the search of the car. The court questioned the defendant's standing to assert privacy rights in stolen property, (II R. 93–94), and finally opined that defendant lacked standing to claim any violation of Fourth Amendment rights with respect to the search of the vehicle. (*Id.* at 94–95). The defendant relies on *Simpson v. United States,* 346 F.2d 291 (10th Cir.) as support for his standing to press his Fourth Amendment claim.

We are mindful that doubt may exist as to the validity of *Simpson* in view of the statements in the Supreme Court's opinion in *Rakas v. Illinois,* 439 U.S. 128, 141 n.9, 99 S.Ct. 421, 429 n.9, 58 L.Ed.2d 387. However in the instant case the trial court, while indicating that standing was lacking, nevertheless ruled on validity of the search of the car in question. Since the record and this ruling on the merits are before us we need not consider the standing question and instead turn to the merits of the claims.

## II

In pressing his Fourth Amendment claims, defendant argues that he was arrested by the military police, that this arrest was made without a warrant or probable cause and was unlawful, and that subsequently unlawful searches occurred of his

person and the car so that the evidence resulting from these searches (the Army license plate Plaintiff's Ex. 3, the Chevrolet registration form Plaintiff's Ex. 4, and the buyer's order form Plaintiff's Ex. 5) were improperly in evidence, as was testimony concerning another registration form, for another person, taken from defendant's wallet. And defendant argues that testimony about statements obtained as a result of this unlawful arrest should have been suppressed. (Brief of Appellant 27–28).

Further defendant contends that the custody of the Aurora police was also a result of the original unlawful arrest so that again evidence obtained such as statements during that custody should likewise be suppressed as the fruit of the poisonous tree. (*Id.* at 29–30).

### a. *The military custody*

Defendant does not contest the legitimacy of the very initial questioning which occurred, conceding that *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, justified this action. (Brief of Appellant, 21–22). He does contend that he was unlawfully "arrested" by being taken to the M.P. station at the direction of Sergeant Sullivan after the initial on the scene investigation was unable to satisfy the M.P.'s as to the ownership of the car. (Brief of Appellant, 22).

There was no warrant for an arrest of defendant. Defendant says that the basis for the arrest was mere suspicion concerning the vehicle in light of defendant's inability to prove to the police that the car was his. Failure of the registration form to match the car and the presence of army license plates on the car were insufficient to establish probable cause, especially in light of defendant's cooperative conduct, his presenting a driver's license, and the absence of any report that the car was stolen. The officers thus detained defendant on "mere suspicion," which in itself is insufficient to justify arrest under *Henry v. United States,* 361 U.S. 98, 101, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (Brief of Appellant, 24–26).

The Government says that the initial detention was justified under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. It never really concedes that defendant was then arrested but states that, "assuming" that defendant was arrested and that evidence was obtained as a result of the arrest, the military officials had probable cause to arrest the defendant under the standards set forth in *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879.[3]

■ An examination of the facts in each particular case is necessary to determine the existence of probable cause. *See Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441. The first military person to come in contact with the vehicle was Specialist Dean who thought the car was "unusual" because it was a civilian car with military plates. The car had a dealer sticker in the window and other decals, further indication that it was not a military vehicle. He reported the car to the desk sergeant at the military police station. (II R. 6–9).

The desk officer, Sgt. Sullivan, sent Specialist Masker, a military policeman, to check out the car. While Specialist Masker was investigating the vehicle (looking for a military decal on the outside of the car to determine what post the vehicle was from) the defendant approached and identified the car as his. (II R. 22–23). In response to a request for identification, specifically a military "log book" used for record keeping, the defendant produced only a registration form for a Chevrolet, explaining that the registration was interchangeable between vehicles. (II R. 23–24). The registration aroused Spec. Masker's suspicions, not only because it was for a Chevrolet rather than a Ford, but also because it appeared to be altered since it was typed in several different forms of typing rather than the usual method of one type. Defendant also produced his driver's license. Spec. Masker called the desk Sergeant, Sgt. Sullivan, to have a military police investigator continue the investigation since defendant had nothing to demonstrate ownership of the car, thus indicating the car might be stolen. (II R. 24–27).

Sergeant Sullivan contacted the military police investigation section to check out the vehicle further. One of the investigators went to the scene, determined that the car did not have valid license plates on it and that it might be stolen. The car and defendant were then transported to the military police station. (II R. 32).

Sergeant Broker, the chief military police investigator at Fitzsimons, was called by Sgt. Sullivan to aid in the investigation. At the time he arrived at the military police desk, defendant was standing outside by his car. Sgt. Broker questioned defendant about certain markings on the registration, which defendant explained were markings indicating that he was a special agent working for the Marine Corps in Camp Lejeune, North Carolina. Sgt. Broker said that he advised the defendant that he didn't believe him because he had no credentials identifying himself as a special agent, because the license plates were improper, and because he should have had a military "log book" to match the license plates. Sgt. Broker then identified himself, informed defendant of the charges that he was suspected of, and advised defendant of his rights. It was Sgt. Broker's opinion that defendant was in custody at the time he first saw the defendant. (II R. 57–62).

■ We feel that the initial detention was justified under *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, i. e., that the military officers were justified in investigating possible criminal behavior even if there was no probable cause to make an arrest at that time. *See United States v. Sanchez,* 450 F.2d 525, 528 (10th Cir.). A civilian car was observed bearing military license plates. Various decals dis-

---

3. The trial court did not specifically rule on the issue of whether there was an arrest, but did state generally that both the military and civilian officers involved committed no infringement of constitutional rights and "acted clearly within the permissible limits of their authority." (II R. 101).

played on the car gave, indication that it was not a military car. Thus the officers were justified in believing that they had encountered possible criminal behavior in that either the car or the military plates were stolen.

 We turn next to the lawfulness of the military officers' actions in taking defendant to the station and detaining him during investigation. In such circumstances of detention for custodial interrogation it is now clear that regardless of whether there was a technical arrest, probable cause the same as for an arrest had to exist. *Dunaway v. New York*, 442 U.S. 200, 215, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824.[4] Therefore we must consider whether probable cause existed for an arrest when defendant was taken to the M.P. station and detained there during the investigation, as was done.

 Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–12, 93 L.Ed. 1879; *United States v. Smaldone*, 485 F.2d 1333, 1350 (10th Cir.), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286. It is not necessary that the officer possess knowledge of facts sufficient to establish guilt, *Holt v. United States*, 404 F.2d 914, 919 (10th Cir.), *cert. denied*, 393 U.S. 1086, 89 S.Ct. 872, 21 L.Ed.2d 779, but more than mere suspicion is required. *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134.

 In the instant case the military officers[5] had been informed of these facts at the time defendant was taken into custody:[6] the vehicle bore military plates even though it was a civilian car; the car did not bear a military decal which it should have if it were an authorized military vehicle; and in response to a request for identification, defendant produced an apparently altered registration form for a Chevrolet even though the car in question was a Ford. Defendant was specifically asked to produce his military log book, which military vehicles carry, and he did not have one. It was at this point that the defendant and the car were taken to the military police station for custodial interrogation.

It is true that after some 10 hours of investigation defendant was released by the military officers after no credible information was developed of theft of the car, as defendant points out. (Brief of Appellant, 24). We cannot agree, however, that this undermines the validity of the actions of the military authorities when taken. We are satisfied that their information was sufficient to establish probable cause for an arrest under the *Brinegar* standard, *see also Sewell v. United States*, 406 F.2d 1289, 1292 (8th Cir.), when the military officers took defendant in custody. Hence their actions were justified and lawful.

### b. *Evidence obtained following the military custody*

We have held that defendant's detention by the military officers was proper so that there was no requirement to exclude all the evidence obtained thereafter in any event as the fruits of unlawful action under

---

**4.** Since we conclude that there was probable cause for an arrest so that the officers' actions were lawful under the *Dunaway* requirement, we need not decide in the instant case whether *Dunaway* is retroactive, as was held in *United States v. Tucker*, 610 F.2d 1007, (2d Cir.).

**5.** It is well settled that an officer may rely upon his fellow officers to supply the information which forms the basis of the arresting officer's reasonable grounds for believing that the law is being or has been violated. *Holt v. United States*, 404 F.2d 914, 918–19 (10th Cir.), *cert.*

*denied*, 393 U.S. 1086, 89 S.Ct. 872, 21 L.Ed.2d 779. Thus it is of no import that the information justifying the defendant's arrest was obtained by several officers, since they shared the various pieces of information with each other.

**6.** We do not consider any other facts here since probable cause must exist at the moment of the arrest. *United States v. Smaldone*, 485 F.2d 1333, 1350 (10th Cir.), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286.

*Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441. However, we still must consider whether the acquisition of the evidence was incident to the lawful arrest or within another recognized exception to the requirement for a search warrant.[7] This analysis requires that we focus on the specific evidence in question.

The evidence admitted against the defendant included the military license plate which was attached to the car, the Chevrolet registration form, a retail buyer's order form which the defendant gave to the Aurora police officer when asked for identification, testimony of an additional registration form which was found in defendant's wallet, statements made by defendant during his detention on the military base, and statements made by the defendant to the FBI after he had been arrested by local officials.[8]

At the suppression hearing the court ruled on the various items separately. As to the military license plate, the court held that it was within plain view and thus not subject to suppression. Defense counsel then stated that he was not contesting the introduction of that particular license plate. (II R. 97). As to the vehicle registrations and the retail buyer's order, the trial court ruled that they would not be suppressed but that the items seemed irrelevant except perhaps in rebuttal. (II R. 100). No ruling was made on any of the statements made by defendant to either the military police or to the FBI agent since, although raised in the motion to suppress, no argument was made as to these statements at the suppression hearing.[9] We too will examine each piece of evidence separately.

We agree with the trial court that the military license plate was in plain view on the outside of the car and hence was subject to seizure. *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067; moreover no expectation of privacy was infringed by its seizure, see *Cardwell v. Lewis*, 417 U.S. 583, 591, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 235 (plurality opinion). As to the Chevrolet registration, we find that this was given voluntarily to the military policeman in response to a request for identification and hence was not seized as the result of any search. See *United States v. Nelson*, 443 F.2d 908 (9th Cir.). The statements which defendant voluntarily made to the military police after being advised of his rights were also admissible since we have already determined that the military custody of defendant was not illegal.[10]

In examining the facts, we note that there was not one but three searches, including one of the defendant's person as well as two searches of the vehicle. The wallet was produced in an inventory of the items on defendant's person when he was brought into the M.P. station. (II R. 27–28). A second officer, Sgt. Broker, also went through defendant's wallet looking for identification, although it is unclear from the record when this took place. (II R. 68). The only evidence resulting from this search was the following testimony by Sgt. Broker:

---

7. Although the main thrust of defendant's argument on appeal is directed to the "arrest," he did contend at the suppression hearing that the military police violated defendant's "right to be secure from the unreasonable searches and seizures." (II R. 92).

8. At the suppression hearing, the defendant argued that other items seized in the search should also be suppressed. We do not deal with evidence which was not admitted at trial since a discussion as to these items would be merely academic. *United States v. Ragsdale*, 470 F.2d 24, 31 (5th Cir.); see *United States v. Self*, 410 F.2d 984, 986 (10th Cir.).

9. At the suppression hearing the court asked defense counsel to state specifically the items he wanted suppressed. (II R. 95). The court then ruled on each item (e. g., II R. 99–100), including the items ultimately introduced at trial. The statements made by defendant to the M.P.'s and the FBI agent were not objected to at this time nor were any rulings made as to them.

10. Defendant does not contest the voluntariness of these statements, arguing only that they were made subsequent to the "illegal arrest."

A. Well, I went through his—the contents of his wallet and found another registration certificate, and I found two blank business checks. I questioned him about that.

Q. With reference to the other registration certificate, did you ask him any questions about that?

A. Yes, ma'am. The answer I got from Mr. Matthews didn't bring up any relevancy to the investigation. He just said that the registration belonged to him even though it had somebody else's name on it. (III R. 32–33).

With respect to the above evidence, we hold that the search of the wallet was proper.[11] As we said in *United States v. Gardner*, 480 F.2d 929, 931 (10th Cir.), cert. denied, 414 U.S. 977, 94 S.Ct. 297, 38 L.Ed.2d 220:

[S]earches of an individual and his wallet or other personal property at this stage of the arrest have been upheld as incident to a lawful arrest when conducted shortly afterward at the jail or place of detention and for the purpose of discovering concealed weapons. Likewise, such search has been upheld as being part of the necessary inventory of an accused's personal property both to preserve the accused's belongings while he is incarcerated and to safeguard the police from a later groundless claim that some item has not been returned to him.

(Footnotes omitted).

Finally we reach the searches of the car.[12] Sgt. Broker testified that he searched the car after defendant was placed in the detention cell. Sgt. Broker specifically denied that he conducted an inventory search of the vehicle, stating:

I did not conduct an inventory. I looked for, like I stated, identification or any other type of contraband, and at that time I found checkbooks and two blank checks of business checks and three other [license] plates, and I also removed the Army tag, brought all these items back into the M.P. station and placed them in front of the Desk Sergeant Sullivan and advised him to have M.P.'s make an inventory of the vehicle. (II R. 63–64).

Sgt. Broker also testified that the purpose of the subsequent inventory search would be to safeguard both the owner and the military police "in case, on a later date, the person stated he had something of value in his car and he did not." (II R. 66). Hence it is apparent that there were two searches of the car, the first one to ascertain evidence of the car's ownership and a subsequent inventory search. We will examine the legality of each of these searches in turn.

We begin with the proposition that there is no general "automobile exception" to the Fourth Amendment requirement of obtaining a warrant. *South Dakota v. Opperman*, 428 U.S. 364, 382, 96 S.Ct. 3092, 3103, 49 L.Ed.2d 1000; *United States v. Jamerson*, 549 F.2d 1263 (9th Cir.). *See*

---

11. *Dunaway v. New York*, notes the difference when the term "arrest" is used in the traditional sense as being "synonymous with those seizures governed by the Fourth Amendment" and when used in a technical sense as having a different meaning, e. g., a formal charge against the person detained. Despite the differing meanings of the term, *Dunaway* concludes that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." 442 U.S. at 216, 99 S.Ct. at 2258.

We read cases defining the right to make a search incident to a lawful arrest, e. g., *Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685, to use the term "arrest" in its traditional but broader sense, thus including a *Dunaway*-type detention. Hence we feel that the search incident to a lawful arrest exception would apply in a situation such as the case before us, whether or not labeled an arrest in the technical sense. Moreover reasons for the exception—the need for search measures protective of the officers and prevention of destruction of evidence—logically apply in the setting of investigative custody as well as when an actual arrest occurs. *See Chimel, supra*, 395 U.S. at 763, 89 S.Ct. at 2040.

12. We cannot accept the Government's contention, even though it was apparently accepted by the trial court, that there was no search. (II R. 101, Brief of the Appellee, 10).

*Coolidge v. New Hampshire*, 403 U.S. 443, 461, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564; *Cooper v. California*, 386 U.S. 58, 61, 87 S.Ct. 788, 790, 17 L.Ed.2d 730. We cannot uphold the first search as incident to defendant's arrest since it was not contemporaneous both in time and in place with defendant's arrest. *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777; *Welch v. United States*, 411 F.2d 66 (10th Cir.). Nor can this first search be justified as an inventory search since Sgt. Broker, the officer who conducted the search, specifically testified that he was not conducting an inventory search.

■ Thus, we must determine whether the search was warranted under the rule of *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, *i. e.*, that where there is probable cause to search a car and exigent circumstances excusing the necessity of obtaining a search warrant, a car may be searched either where stopped or later at the station house. The probable cause requirement is satisfied when the officers conducting the search have "reasonable or probable cause" to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search. *Dyke v. Taylor Implement Co.*, 391 U.S. 216, 221–22, 88 S.Ct. 1472, 1475–76, 20 L.Ed.2d 538. And, if after a valid investigatory stop, probable cause then arises, a search may be made. *United States v. Garcia-Rodriguez*, 558 F.2d 956, 964 (9th Cir.), *cert. denied*, 434 U.S. 1050, 98 S.Ct. 900, 54 L.Ed.2d 802. Finally, in determining whether probable cause existed to search an automobile, the court must evaluate the collective information of all the officers. *Wood v. Crouse*, 436 F.2d 1077, 1078 (10th Cir.), *cert. denied*, 402 U.S. 1010, 91 S.Ct. 2193, 29 L.Ed.2d 432.

■ We feel that the facts of this case indicate that there was probable cause to search the vehicle for evidence pertaining to its theft. The car had an improper license plate and was obviously not a military vehicle as claimed by defendant. Defendant produced an altered registration form for a different make of car as evidence of ownership. The officers had probable cause to believe that the car and the military plate were stolen and thus probable cause to search the car for evidence of the crime; *e. g.*, a correct registration form for the car indicating the true owner. Thus, we determine that the first part of the *Chambers* test is satisfied in that there was probable cause to search the vehicle.

■ We must next determine whether "exigent circumstances" were present. It could be argued that such circumstances were absent in the instant case where the car was parked on a military base rather than on an "open highway" as in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. And the defendant was in police custody with no indication of any accomplices who might attempt to move the car. However, we agree with the determination in *Haefeli v. Chernoff*, 526 F.2d 1314 (1st Cir.), on facts analogous to this case. In *Haefeli*, the defendant's car was parked on a street. The court quoted *Cardwell v. Lewis*, 417 U.S. 583, 593, 94 S.Ct. 2464, 2470, 41 L.Ed.2d 325, in finding that exigent circumstances were still present: "Here, as in *Chambers v. Maroney*, . . . the automobile was seized from a public place where access was not meaningfully restricted." 526 F.2d at 1317.

In our case, defendant's car was parked on a military base in front of a military hospital. While perhaps not as public as a public parking lot, we find it to be closer to a public parking area than the private driveway in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. And in *Haefeli*, the court noted that even though there was nothing to indicate that an accomplice might come forward to move the vehicle after the arrest, "the *Cardwell* Court eliminated this factor as a bar to a finding of exigent circumstances." 526 F.2d at 1318. We feel that in this case, as in *Haefeli*, there were sufficient exigent circumstances to justify the warrantless search of the car. *Wood v. Crouse, supra*, 436 F.2d at 1078–79. Consequently, the

first search of the car was a permissible search under the rule of *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419.

■ We likewise uphold the second search of the car under the principles of *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000. As discussed earlier, this inventory search was pursuant to standard police practice, the purpose of which was to safeguard the owner of the items in the car and also to safeguard the military police in the event the owner claimed that something of value was missing from his car.[13] (II R. 66). Thus the search was in accord with the guidelines set forth in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000. *See United States v. Martin*, 566 F.2d 1143 (10th Cir.).

■ It is also clear that the Aurora policeman had probable cause to stop defendant since he had information from military authorities indicating that the car might be stolen. *See Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660. Finally, the statements made to the FBI agent after defendant was given *Miranda* warnings were also admissible.[14] Because the arrests and searches were legal, *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416, relied on by defendant, is inapplicable. Therefore, there was no error in the introduction of any such evidence and the judgment is

AFFIRMED.

---

**13.** We note that the Aurora police officer who arrested defendant testified that the only information that was relayed to him and on which he acted in stopping defendant was that the military police were escorting a "suspicious vehicle and party out the gate" and that the "vehicle had no registration" (II R. 75, 82–83).

Therefore, it is unclear whether any of the fruits of the searches of the car were actually used, even had the searches been deemed to be illegal.

**14.** As noted earlier, no claim is made that the statements were involuntary.