**UNITED STATES of America**

v.

**Arietta VENIZELOS, Defendant.**

**No. 80 Cr. 282.**

United States District Court,
S. D. New York.

Aug. 6, 1980.

John S. Martin, Jr., U. S. Atty. for the Southern District of New York, New York City, for the United States of America; Mark F. Pomerantz, Asst. U. S. Atty., New York City, of counsel.

William M. Kunstler, C. Vernon Mason, New York City, for defendant.

## OPINION

EDWARD WEINFELD, District Judge.

The defendant, Arietta Venizelos, indicted with others for conspiracy to acquire by forgery and fraud, and to distribute large quantities of controlled prescription drugs, moves to suppress the fruits of two searches carried out by federal and state agents on March 31 and April 2, 1980 upon the claim that they were seized in violation of her rights under the Fourth Amendment to the United States Constitution. At a hearing, defendant's version of the pertinent facts was in sharp conflict with the testimony of the government's four witnesses. The latter included one of the two federal agents who arrested the defendant on March 31, 1980; the owner of the house in which she had been living at the time of her arrest; and the two New York State agents who, with the consent of the owner, searched the room in which she had been living on April 2, 1980. The Court, upon a review of all the testimony and based upon the demeanor of the witnesses, accepts the testimony of the government's witnesses as to significant matters with respect to each branch of defendant's motion.

At the time of her arrest, the defendant was living in a room of a large single-fami-

ly dwelling located at 13 Chadwick Road, White Plains, New York that was owned by a Mr. & Mrs. Gordon Kinney, the parents of defendant's friend, Leslie Kinney. At approximately 5:30 p. m. on the day of arrest, the defendant left the Kinney residence driving a small rental car. A short distance from the Kinney residence, the defendant's car was stopped by special agents Egan and Lucier of the Federal Drug Enforcement Administration ("DEA") acting pursuant to a warrant for her arrest issued under an indictment charging a conspiracy to distribute controlled drugs, unrelated to the instant charge. The defendant denied her identity and asserted that she was Leslie Kinney. When the agents disputed that assertion, Venizelos produced, under circumstances detailed hereafter, a driver's license in the name of Leslie Kinney and claimed it as her own. When the agents still said she was lying, Venizelos offered to prove her identity by returning to the Chadwick Road house where her "mother," Mrs. Kinney, would verify her identity. The agents accepted the offer and drove Venizelos back to the house. Upon entering, the defendant said to Mrs. Kinney, "tell them who I am; tell them I am Leslie." Mrs. Kinney, however, replied, "Arietta, I cannot lie for you." Shortly thereafter the agents transferred Venizelos by car to the District Office of the DEA in Manhattan.

### 1. *The Search on March 31, 1980.*

When the defendant at the time of her arrest while in the car sought to cloak her identity and was challenged by the arresting officers, she started to reach for a purse, or as sometimes described, a handbag, on the seat beside her purportedly to show the agents her driver's license. Agent Egan, however, stopped her, took the purse, opened it, removed a wallet which he handed to her and she then produced a driver's

license in the name of Leslie Kinney. After the stop-off at the Kinney residence where Mrs. Kinney refused to support defendant's false claim that she was Mrs. Kinney's daughter, she was taken to the DEA headquarters where a more thorough search was made of the contents of the purse. It was found to contain needles, syringes, some pills and marijuana.

■ The government justifies the search of the handbag under separate concepts. First, it alleges that the handbag was legally searched at the time of her arrest in the car under the rationale of *Chimel v. California*.[1] Agent Egan testified that he took the purse as Venizelos "started to go into [it]" in order to produce identification when the agents indicated disbelief in her stated identity. This initial search was incidental to her lawful arrest under the warrant. The handbag was, at that time, within the area of Venizelos' "immediate control." *Chimel* teaches that an officer is justified in making an immediate, protective search of "the area from within which [an arrestee] might gain possession of a weapon or destructible evidence."[2] Here the handbag clearly fell within that area.[3] Moreover, the fact that the arresting agents suspected that defendant was lying in denying her identity justified an apprehension that the handbag may have contained a weapon or destructible evidence. A full search of the handbag was not made until the defendant was taken to the DEA headquarters after the brief stop-off at the Kinney home where defendant's effort to sustain her false identity failed. In the circumstances, the delay of several hours between the initial seizure and search at the time of the arrest in White Plains and the final search at a different location in New York City did not render the subsequent search impermissible.[4] It is beyond challenge that the initial search by Agent Egan was lawful; in-

1. 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

2. *Id.*

3. *See United States v. Edmonds*, 535 F.2d 714, 720 (2d Cir. 1976); *United States v. Lam Muk Chiu*, 522 F.2d 330, 332 (2d Cir. 1975); *United States v. Moreno*, 569 F.2d 1049, 1052 (9th Cir.), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1615,

56 L.Ed.2d 64 (1978); *United States v. Johnson*, 495 F.2d 378, 381 (4th Cir.), *cert. denied*, 419 U.S. 860, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974).

4. *See United States v. Lam Muk Chiu*, 522 F.2d 330, 332 (2d Cir. 1975); *United States ex rel. Muhammad v. Mancusi*, 432 F.2d 1046, 1047 (2d Cir. 1970), *cert. denied*, 402 U.S. 911, 91 S.Ct. 1391, 28 L.Ed.2d 653 (1971); *United*

deed, any other conduct on his part would have been foolhardy.[5]

■ The defendant's contention that the agents should have obtained a search warrant before viewing the other contents of the handbag at the DEA headquarters, ignores the fundamental purpose of the Fourth Amendment, which is to protect persons' reasonable and legitimate expectations of privacy.[6] Once the initial intrusion and seizure—which were entirely lawful—had been made, the defendant could no longer be said to entertain a reasonable expectation of privacy in the contents of the bag. To require the agents to suspend their search at that point until a warrant had been obtained would have served no useful purpose. Indeed, as Judge Friendly remarked in similar circumstances, "[i]t would outrage common sense and human nature to read the Fourth Amendment to require that after having lawfully opened the briefcase and inspected [the incriminating evidence], . . . the police should be required to interrupt their work and apply for a warrant before going further . . . ."[7] Moreover, to impose upon law enforcement officers a warrant requirement once they had interrupted the progress of their search (incidentally, at the

defendant's request to verify her identity claim) would only induce them to make a full, on the spot, public search of all properly confiscated items—a result that would undoubtedly exacerbate the arrestee's humiliation[8] while posing increased risks to the officers.[9] Where the initial intrusion is lawful, a decision to postpone further search into a properly seized item until it has been brought to a more private and secure place does not render the subsequent, more detailed search of the same item constitutionally impermissible.[10]

■ The second justification asserted for the search of the handbag is somewhat intertwined with the first. By putting in issue her identity and suggesting that inspection of her license would prove that she was Leslie Kinney, the defendant in essence invited the initial search. That the agents prudently declined to permit her to take the license from the handbag, and chose instead to do so themselves, does not alter the fact of her inferential consent. It was the defendant who claimed to be someone other than herself; who requested access to the identification in the handbag; and who acquiesced when the agents carried out her request to support her claim of identity.[11] In a realistic sense, she consented.

States v. Frankenberry, 387 F.2d 337, 339 (2d Cir. 1967). See also United States v. Johnson, 495 F.2d 378, 380, 382 (4th Cir.), cert. denied, 419 U.S. 860, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974); United States v. DeLeo, 422 F.2d 487, 491–93 (1st Cir.), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970). Cf. Abel v. United States, 362 U.S. 217, 239, 80 S.Ct. 683, 697, 4 L.Ed.2d 668 (1960).

5. Cf. United States v. Johnson, 495 F.2d 378, 381 (4th Cir.), cert. denied, 419 U.S. 860, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974).

6. See Smith v. Maryland, 442 U.S. 735, 739–40, 99 S.Ct. 2577, 2579–80, 61 L.Ed.2d 220 (1979) (citing cases); United States v. Chadwick, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977); Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); id. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

7. United States v. Ochs, 595 F.2d 1247, 1259 (2d Cir. 1979).

8. See United States ex rel. Muhammad v. Mancusi, 432 F.2d 1046, 1047 (2d Cir. 1970), cert. denied, 402 U.S. 911, 91 S.Ct. 1391, 28 L.Ed.2d

653 (1971). ("Nothing could be more consistent with a decent regard for the preservation of [the defendant's] right to human dignity than the act of the officers here in not publicly overhauling [his] personal effects in the lobby of the bank.")

9. See United States v. Frankenberry, 387 F.2d 337, 339 (2d Cir. 1967). Cf. United States v. Garcia, 605 F.2d 349, 356 (7th Cir. 1979).

10. See cases cited in note 4, supra.

11. Other courts in cases with facts identical to this have reached the same result albeit upon a slightly different rationale. See United States v. Johnson, 495 F.2d 378, 381 (4th Cir.), cert. denied, 419 U.S. 860, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974) (agent acted reasonably in opening defendant's handbag to check her identification; handbag "became a legitimate subject of the officers' search" after defendant had put her identity in issue); United States v. Jeffers, 524 F.2d 253, 256 (7th Cir. 1979) (in asking officer to open her purse, the defendant "gave up any expectations of privacy she might have had" in its contents).

Third, the search of the handbag was justified as a search incident to a lawful arrest. The Supreme Court has repeatedly held that, following a lawful arrest, "both the person *and the property in his immediate possession* may be searched at the station house after the arrest has occurred at another place and if evidence of crime is discovered, it may be seized and admitted in evidence."[12] The items that may lawfully be seized incident to an arrest have been variously described as "the effects in [the defendant's] immediate possession that constitute[ ] evidence of crime";[13] the "personal effects of the accused";[14] and "any evidence of crime in [the defendant's] immediate possession."[15] Moreover, the right to conduct such a search exists whether or not the agent believes he is exposed to danger or suspects that the defendant has access to destructible evidence.[16]

Under this standard, the seized handbag qualifies as both an "effect" intimately associated with the defendant's person and one found in her immediate possession. These same rationales, enunciated in *United States v. Robinson*[17] and *United States v. Edwards*[18] have provided the justification for warrantless searches of wallets, purses, and handbags carried by arrestees.[19] Indeed, long before the decision in *Edwards*, the Supreme Court had upheld, in *Draper v. United States*,[20] the warrantless search upon probable cause of a zipper bag containing narcotics and drug paraphernalia carried by an arrestee disembarking from a train. The instant case comes squarely within that rule. The fact that the items the defendant seeks to suppress came from the purse next to her and not from her person is without constitutional significance.

Defendant argues, however, that the scope of searches incident to arrest has been severely restricted by two recent Supreme Court cases, *United States v. Chadwick*,[21] and *Arkansas v. Sanders*,[22] in which the

12. *United States v. Edwards*, 415 U.S. 800, 803, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771 (1974) (emphasis added). *See id.* at 803 n.4, 94 S.Ct. at 1237 n.4 (citing cases); *Gustafson v. Florida*, 414 U.S. 260, 263–64, 94 S.Ct. 488, 491, 38 L.Ed.2d 456 (1973); *United States v. Robinson*, 414 U.S. 218, 224, 94 S.Ct. 467, 471, 38 L.Ed.2d 427 (1973); *see also United States v. Edmonds*, 535 F.2d 714, 720 (2d Cir. 1976); *United States v. Lam Muk Chiu*, 522 F.2d 330, 332 (2d Cir. 1975); *United States ex rel. Muhammad v. Mancusi*, 432 F.2d 1046 (2d Cir. 1970), *cert. denied*, 402 U.S. 911, 91 S.Ct. 1391, 28 L.Ed.2d 653 (1971).

13. *United States v. Edwards*, 415 U.S. 800, 805, 94 S.Ct. 1234, 1238, 39 L.Ed.2d 771 (1974).

14. *Id.* at 806, 94 S.Ct. at 1238.

15. *Id.* at 805, 94 S.Ct. at 1238.

16. *United States v. Chadwick*, 433 U.S. 1, 14–15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977); *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 265–66, 94 S.Ct. 488, 491–92, 38 L.Ed.2d 456 (1973).

17. 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

18. 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

19. *See, e. g., United States v. Matthews*, 615 F.2d 1279 (10th Cir. 1980) (wallet); *United States v. Moreno*, 569 F.2d 1049 (9th Cir.), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1615, 56 L.Ed.2d 64 (1978) (purse); *United States v. Jeffers*, 524 F.2d 253 (7th Cir. 1975) (purse); *United States v. Johnson*, 495 F.2d 378 (4th Cir.), *cert. denied*, 419 U.S. 860, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974) (woman's handbag); *United States ex rel. Muhammad v. Mancusi*, 432 F.2d 1046 (2d Cir. 1970), *cert. denied*, 402 U.S. 911, 91 S.Ct. 1391, 28 L.Ed.2d 653 (1971) (briefcase and wallet). *See also United States v. Garcia*, 605 F.2d 349, 357 n.12 (7th Cir. 1979) (citing cases).

The courts have divided over whether the seizure of an attache case carried by the defendant can be characterized as incident to an arrest. At least two courts have held that it can be, *see United States v. Frick*, 490 F.2d 666 (5th Cir. 1973), *cert. denied*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1971); *United States v. Lam Muk Chiu*, 522 F.2d 330 (2d Cir. 1975); and one, that it cannot be. *See United States v. Berry*, 560 F.2d 861 (7th Cir. 1977), *modified*, 571 F.2d 2 (7th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978).

20. 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

21. 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

22. 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

court held warrantless searches of a footlocker and of hand luggage seized from the trunk of a moving automobile violative of the Fourth Amendment. Although both of these cases contain some language supportive of the defendant's position, their facts are distinguishable from those of the case at bar. In *Chadwick* the court found that the defendants had a legitimate expectation of privacy in the contents of a 200-pound double-locked footlocker seized and searched by agents as it was being loaded into the trunk of an automobile; and in *Sanders* the court expanded the principle of *Chadwick* to cover a "comparatively small, unlocked suitcase"[23] carried in the trunk of a moving vehicle. Although the police in *Sanders* were justified in stopping the vehicle and arresting its occupants, and had probable cause to believe that the suitcase contained contraband, the court held that in the absence of exigent circumstances, "[a] lawful search of luggage generally may be performed only pursuant to a warrant."[24]

It is true, as the defendant argues, that the handbag at issue here, like the footlocker and luggage of *Chadwick* and *Sanders*, served as "a common repository for the defendant's personal effects, and therefore was inevitably associated with the expectations of privacy."[25] But there are obvious, significant differences between them as well. As the Court of Appeals for the First Circuit, whose opinion was affirmed on appeal, stated in the *Chadwick* case:

> [T]here is considerable difference between items such as [a] hand-carried briefcase and the footlocker here. Portable objects in hand such as zipper bags, briefcases and small suitcases, fit without

too much difficulty into *Chimel's* "immediate control" standard. Their size, accessibility, and portability all liken them to "personal effects" found on an arrestee's person, such as clothing or a cigarette package in one's pocket, which may lawfully be searched without a warrant as incident to an arrest. *See United States v. Robinson, supra; United States v. Edwards, supra.* To exclude searches of such items can create "gossamer thin" distinctions which arresting officers could find impracticable, if not impossible, to follow; and where the justification for a search depends to a great extent on the reasonable judgments which the arresting officers could have made at the time of arrest, *see United States v. Robinson, supra*, those distinctions would appear unwarranted.[26]

In affirming that opinion, the Supreme Court limited its holding to "luggage or other personal property not immediately associated with the person of the arrestee."[27] Thus, the court left intact the long line of cases authorizing searches incident to arrest of personal effects—such as the handbag involved here—found in the immediate possession of the arrestee during the course of a lawful arrest.[28] And it reiterated prior holdings that: "The potential dangers lurking in all custodial arrests make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved."[29]

We are convinced that the facts of the instant case are sufficiently distinct from those of *Chadwick* and *Sanders* to render those cases inapposite.[30] Here the handbag

23. *Id.* at 762 n.9, 99 S.Ct. at 2592 n.9.

24. *Id.* at 762, 99 S.Ct. at 2592.

25. *Id.; United States v. Chadwick*, 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977).

26. *United States v. Chadwick*, 532 F.2d 773, 780 (1st Cir. 1976), *aff'd*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (footnote omitted).

27. 433 U.S. at 15, 97 S.Ct. at 2485.

28. See cases cited in notes 12 and 19, *supra*. *See also Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

29. *United States v. Chadwick*, 433 U.S. 1, 14–15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977) (citing *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) and *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

30. *United States v. Berry*, 560 F.2d 861 (7th Cir. 1977), *modified*, 571 F.2d 2 (7th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978) is also inapposite. In *Berry* the court analogized an attache case carried in hand to the luggage involved in *Chadwick*; it held that attache cases are " '[not] immediately associated with the person of the arrestee,' " 560 F.2d at 863 (*quoting United States v. Chad-*

was small, readily accessible to the defendant, portable, easily capable of being opened, and within the defendant's grasp. It was not heavy, or difficult to carry or maneuver. It carried items normally closely associated with the person itself—identification, cosmetics, money, a wallet, and other items one would normally carry at all times. Indeed, it is reasonable to suppose that had it not been seized at the time of the arrest, the defendant probably would have brought the handbag with her to the DEA district office for identification and to assist in "booking," at which time its contents could have been inspected and inventoried under routine police procedures.[31] Finally, it should be emphasized that the crucial distinction between this case and *Chadwick* and *Sanders* is that here the arresting officers had an independent, lawful justification for opening and searching the handbag at the very scene of the arrest; and in fact, the initial intrusion took place at that time. When they opened the handbag for the first time, any future expectations of privacy on the defendant's part were eliminated.

For all of these reasons and under each of these rationales, we conclude that the seizure and search of Venizelos' handbag on March 31 did not violate her Fourth Amendment rights.

### 2. *The April 2, 1980 Search.*

The evidence establishes that the defendant was friendly with three daughters of the Kinneys, particularly Leslie, and that prior to March 1980 occasionally she was invited to spend a few nights at the Kinney home occupying whichever room was available.

Early in March 1980 the defendant telephoned to talk to Leslie, who was away, and Mrs. Kinney, when defendant informed her she had no place to stay, invited her to stay at her home because there was an empty room. The defendant occupied the bedroom of Sarah Kinney from early March until her arrest on March 31. During this period some of Sarah's belongings remained in the room. The defendant did not pay rent nor did she have any arrangement with Mrs. Kinney, Leslie or any other member of the family for rental payment. She reimbursed the Kinneys for telephone calls, incidentals and some expenses incurred for the rental of a car by using Leslie's credit card. The evidence is compelling that the defendant was not a rent-paying "tenant" in the Kinney home, but occupied Sarah's vacant room as a family friend and guest—in short, the use of the room was solely at the will and sufferance of Mrs. Kinney who was free at all times to enter the room.

On April 2, three days after defendant's arrest, Agent Curran, a senior narcotics investigator from the New York State Department of Health, and Detective Connor of the Westchester Police Department, in the course of an investigation went to the Kinney residence to question Mrs. Kinney concerning defendant and any connection between her and Leslie Kinney. Mrs. Kinney, who readily responded to the officers' questioning, informed them of the circumstances under which the defendant had stayed at her home as related above. The agents requested and obtained permission from Mrs. Kinney to search the room formerly occupied by the defendant before her arrest. Mrs. Kinney signed a written consent form embodying her authorization. The wording of this form was dictated to her by Detective Connor. She accompanied the agents to the room, the door to which had been left open, and was present while they conducted the search, pointing out to them items that belonged to her daughter and those that were defendant's. The agents found and confiscated certain items,

---

*wick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977)), and thus, that warrantless searches and seizures of them are impermissible in the absence of exigent circumstances. However, the court specifically suggested that the warrant requirement would be inapplicable for seizures of "purses." *Id.* at 864. The handbag at issue here was essentially the same as a purse—indeed, that is the term used by the arresting officer to describe it.

**31.** *See United States v. Jeffers*, 524 F.2d 253, 255 (7th Cir. 1975). *Cf. Abel v. United States*, 362 U.S. 217, 239, 80 S.Ct. 683, 697, 4 L.Ed.2d 668 (1960).

## 1284

including a quantity of illicit drugs and drug paraphernalia on the floor, on a nightstand next to the bed, and on the shelf of a closet, the door to which had been left open. The defendant seeks to suppress these items from introduction into evidence upon the trial.

█ It is well established that the voluntary consent of an authorized person, including a third party, is sufficient to validate a warrantless search.[32] The defendant intimates that Mrs. Kinney's consent to search was involuntary and that in any event she was not authorized to give consent.

█ The first of these contentions requires only but brief refutation. Mrs. Kinney, an intelligent woman experienced in business affairs, was interviewed in the familiar surroundings of her home by two law enforcement officers. She readily responded to their inquiries. Her attitude was entirely cooperative. It is evident that she regarded it as a civic duty to cooperate with officials engaged in investigations. Her attitude on this occasion was consistent with that manifested on March 31 when she rejected the defendant's efforts to lie on her behalf. There is nothing in the record to suggest coercion or that Mrs. Kinney's will was overborne by the officers.[33] And indeed Mrs. Kinney herself makes no such claim.

█ It is abundantly clear that on April 2, when the officers arrived at her home, Mrs. Kinney was in complete and exclusive control of her home and possessed the requisite authority to consent to a search of any part of the premises. And even were one to assume, contrary to the fact, that she was not in complete control of the entire premises, she still had authority under all the circumstances to consent to the inspection. The evidence establishes Mrs. Kinney never relinquished control over the room and that she maintained "common authority". over its use throughout. In *United States v. Matlock*,[34] the Court stated that valid consent may be obtained "from a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." [35] In explaining the concept of "common authority," the court added:

> The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see *Chapman v. United States*, 365 U.S. 610 [81 S.Ct. 776, 5 L.Ed.2d 828] (1961) (landlord could not validly consent to the search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.[36]

The record leaves no room to doubt that Mrs. Kinney maintained "common authority over [and a] sufficient relationship to the premises" to authorize their inspection [37]

32. See, e. g., *United States v. Matlock*, 415 U.S. 164, 171 & n.7, 94 S.Ct. 988, 993 & n.7, 39 L.Ed.2d 242 (1974); *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969); *United States v. Isom*, 588 F.2d 858 (2d Cir. 1978).

33. Of course, the mere presence of police officers in the Kinney home, "absent any indication of coercive words or acts on their part, is insufficient to raise an inference that Mrs. [Kinney's] consent was an unwitting and unwilling submission to police authority." *United States v. Peterson*, 524 F.2d 167, 178 (4th Cir. 1975), *cert. denied*, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976) (citing cases). *Cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973).

34. 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

35. *Id.* at 171, 94 S.Ct. at 993 (footnote omitted).

36. *Id.* at 171 n.7, 94 S.Ct. at 993.

37. Other courts as well have held that the owner of a private dwelling retains authority over the use of its unlocked, unrented rooms as against the privacy claims of non-paying occupants, whether family members or guests. See, e. g., *United States v. Dubrofsky*, 581 F.2d 208, 212 (9th Cir. 1978); *United States v. Wright*, 564 F.2d 785, 790 (9th Cir. 1977); *United States v. Peterson*, 524 F.2d 167, 180 (4th Cir. 1975), *cert. denied*, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976); *United States v.*

and she gave such authorization freely and voluntarily.

 And even if it were held that Mrs. Kinney did not have authority to permit inspection of the room during the period of the defendant's occupancy up to March 31, the issue in this case is narrower. Certainly by April 2, when the search occurred, which was three days after her non-paying guest had departed with no prospect of returning, full authority over the room had reverted to Mrs. Kinney.[38] Indeed, to hold otherwise would border on the absurd. Finally, it should be noted that all items confiscated within the Kinney residence were found "in plain view": some were discovered on a nightstand next to a bed, and others on the shelf of an open closet. Thus, this is not a case in which a third party purported to authorize the search of a houseguest's locked luggage or hidden private effects.[39]

For the foregoing reasons, the defendant's motion to suppress evidence seized on March 31 and April 2, 1980 is denied in all respects.

So ordered.

---

Jenkins, 496 F.2d 57, 71–72 (2d Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975); *United States v. Novick,* 450 F.2d 1111, 1112–13 (9th Cir. 1971), *cert. denied,* 405 U.S. 995, 92 S.Ct. 1271, 31 L.Ed.2d 464 (1972); *United States v. Cataldo,* 433 F.2d 38, 40 (2d Cir. 1970), *cert. denied,* 401 U.S. 977, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971); *Maxwell v. Stephens,* 348 F.2d 325, 337 (8th Cir.), *cert. denied,* 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353 (1965) (Blackmun, J.).

**38.** *Abel v. United States,* 362 U.S. 217, 240–41, 80 S.Ct. 683, 697–98, 4 L.Ed.2d 668 (1960);

*Maxwell v. Stephens,* 348 F.2d 325, 337 n.15 (8th Cir.) *cert. denied,* 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353 (1965) (Blackmun, J.).

**39.** *See United States v. Isom,* 588 F.2d 858, 861 (2d Cir. 1978) (tenant could consent to search of apartment, even though guest was present, but was not authorized to consent to search of guest's locked box); *Maxwell v. Stephens,* 348 F.2d 325, 338 (8th Cir.), *cert. denied,* 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353 (1965) (Blackmun, J.).