UNITED STATES of America, Plaintiff,

v.

Alan LEVINE, Dennis Barry, Lawrence Okun, and Gary Cohen, Defendants.

No. CR–80–48.

United States District Court,
W. D. New York.

Nov. 6, 1980.

Richard J. Arcara, U. S. Atty., Buffalo, N. Y. (Michael R. Lindburg, and J. Glenn Davis, Asst. U. S. Attys., Buffalo, N. Y., of counsel), for plaintiff.

Pack, Grashow, Palmer, Greenman, Hurley & Ball (Herbert L. Greenman, Buffalo, N. Y., of counsel), and Condon & Sedita, Buffalo, N. Y. (Rodney O. Personius, Buffalo, N. Y., of counsel), for defendant Levine.

Louis M. Cacciato, Tonawanda, N. Y., for defendant Barry.

John J. Carney, Buffalo, N. Y., for defendant Okun.

David M. Yellen, Buffalo, N. Y., for defendant Cohen.

CURTIN, Chief Judge.

Defendants Alan Levine, Dennis Barry, and Lawrence Okun seek to suppress evidence seized during the course of the execution of search warrants at 185 Nassau Avenue (Okun residence), 351 Wellington Avenue (Barry residence), and 58 Irving Terrace (Levine residence), all located in the Town of Tonawanda, New York. The court, at the hearing, has heard testimony from the officers who executed the warrants at the premises and from Mrs. Levine, mother of defendant Alan Levine.

The search warrants with affidavits were introduced into evidence along with a tape recording of a confidential informant who appeared before the Honorable Penny Wolfgang, County Court Judge of Erie County, who issued the search warrants for the Barry (351 Wellington Avenue) and Okun (185 Nassau Avenue) premises on March 11, 1980. These warrants were executed on March 12, 1980. Following the execution of these warrants and the arrest of Lawrence Okun on March 12, 1980, an application was made to United States Magistrate Edmund F. Maxwell, who issued the search warrant for the Levine premises at 58 Irving Terrace.

The application to Judge Wolfgang for search warrants for the premises of Okun at 185 Nassau and Barry at 351 Wellington were made by Detective David J. Morgante of the Buffalo Police Force. Morgante's affidavit in each case related that a reliable informant had been on the premises in the presence of Okun and Barry respectively and had recently seen a substance which the defendant in each case had identified as cocaine. The informant appeared before Judge Wolfgang and related in detail his experience with Okun and Barry at their residences. I listened to the tape made of the interview by Judge Wolfgang and read the Morgante affidavit. It is apparent that there was a reasonable cause to believe that there was contraband on the premises of each residence and that the court was justified in issuing a search warrant. The execution of the search warrants in each case was properly carried out,

and the evidence seized may be introduced into evidence if relevant to the case.

Defendant Lawrence Okun was arrested in the parking lot of the Shoreline Apartments in downtown Buffalo at about 5:30 p. m. on March 12, 1980. Okun and the Drug Enforcement Administration [DEA] agents had been in contact for some months before this time, and on March 12 Okun had agreed to deliver three pounds of cocaine to Agent John Brown of the DEA, who had been working undercover. At about 3 p. m. on March 12, Okun told Brown on the telephone that he had not yet heard from "his man." About an hour later, the confidential informant told Brown that Okun was going to "Alan's house" to pick up the cocaine. Agents watching Okun told Brown that Okun was seen entering and leaving the Alan Levine residence at 58 Irving Terrace at about 5 p. m. At 5:30 p. m., when Brown met Okun near the Shoreline Apartments, Okun told him that he had brought only "half the laundry" at that time. Okun said that his man was holding "ten," and if Brown wanted more, he would return to pick up the rest of the promised delivery. When Okun transferred the pound of cocaine to Agent Brown, he was arrested. At this time, defendants Levine, Barry, and Cohen were not under arrest.

Fearing that Okun had left the rest of the cocaine at 58 Irving Terrace and believing that it could be destroyed if action was not taken, Special Agent Behrens was directed to go to 58 Irving Terrace and secure the premises until a search warrant was obtained. When he arrived there at about 6:30 p. m., he observed no activity and positioned himself outside the house. A short time later, however, he noticed a light on in the basement. Because there was no light there upon arrival, the agents concluded that someone was on the premises. Agents then went to both the front and side doors of the house, and an older woman, later identified as Mrs. Levine, met them at the side door. Behrens identified himself and told her that they were there to secure the premises pending issuance of a search warrant. After entering, Behrens and the other officers walked through the entire house, including the third floor and basement, but only looked in those areas where a person could possibly secrete himself. Mrs. Levine's testimony supported the agent's version.

■ At the hearing, Mrs. Levine testified that she was politely treated but was not allowed to make a phone call when the agents first arrived and had to wait for about 20 minutes after they entered the house. She called her husband, who came home a short time later. He was permitted to call the family attorney. In the meantime, Agent Brown had gone to the Magistrate to secure a search warrant. A more complete search of the premises was conducted at about 8:15 p. m., when the officers were notified that the Magistrate had issued a warrant. In his application, Agent Brown set forth the history of his prior dealings with defendant Lawrence Okun, his arrest of Okun, and the connection between Barry, Okun, and Levine through the prior months. There was sufficient information before the Magistrate to issue the warrant.

Defendant Levine argues that the entry of the agents on the premises at 58 Irving Terrace was improper, and because of that, any contraband found must be suppressed. The government argues that there were exigent circumstances which justified the warrantless intrusion into the Levine residence. The government also argues that there was a likelihood that whoever was in the residence would attempt to destroy the cocaine.

There is little evidence in the record, however, to justify the government's fears. The government claims that the agents had reason to believe that Okun's partners had observed his arrest. In addition, they also argue that Okun's failure to return would have forewarned the others that the police had arrested Okun. It is undisputed, however, that the DEA agents did not actually see anyone watching them make the arrest, nor is there any indication that Okun attempted to alert the others as he was being arrested. Moreover, the simple failure to

return on time could have been caused by any number of events and was unlikely, by itself, to alert the other defendants and result in the destruction of the cocaine.

The cases relied upon by the government involve much stronger cases for the presence of exigent circumstances. They involve situations where the government agents on the scene were without an alternative but to act before a warrant could issue in order to prevent destruction of the evidence or endangering the public safety. In *United States v. Rubin*, 474 F.2d 262 (3d Cir. 1973), for example, agents had trailed the defendant and watched as he delivered a crate known to contain hashish to his home. Shortly after disposing of the crate, the defendant became aware that he was under surveillance and attempted to evade the officers. The defendant's car was stopped, and he was actually arrested at a neighborhood gas station only six blocks from his home. As he was being taken into custody, the defendant yelled to the gas station attendants and spectators, who appeared to be known to the defendant, "Call my brother." 474 F.2d at 264. Because the defendant's call to the onlookers might well have been a signal to alert the others of imminent police intervention, the Court of Appeals concluded that the officers had a reasonable basis to search the defendant's home for the contraband without waiting for a warrant.

In *United States v. Picariello*, 568 F.2d 222 (1st Cir. 1978), another case relied on by the government, a cache of dynamite had been stolen, several bombings had occurred, and the police had very firm evidence to believe that the explosives were on the premises searched. Although the officers had made arrangements to obtain a warrant, they entered the house to secure the dynamite before the warrant was actually issued. The Court of Appeals concluded that the officers acted reasonably in light of the threat to the public safety posed by the unrecovered explosives.

■ In our case, we have neither an attempt to alert the other defendants nor an immediate threat to the public safety. The only urgency in the instant case stems from the officers' knowledge that the other defendants were still at large, and that the contraband had not yet been seized. It does not follow from these two facts that the person observed in the Levine residence was one of the other defendants nor that the defendants would be aware of Okun's arrest. Some indication that the other defendants were aware of Okun's arrest, or that Okun had attempted to alert them, would be necessary to show exigency, at the least. In addition, under the circumstances of this case, it is unlikely that Okun's failure to return for the other "half [of] the laundry" would alert the other defendants that something was awry. The mere fact that Okun had offered to sell Agent Brown the other "ten," *if* he wanted more, was simply too indefinite to alert the others. There is no evidence whatsoever that the other defendants expected an immediate show of buyer interest in their offer, were expecting to make a second sale on the same day, or even were waiting to hear from Okun after the sale.

It is also worth noting that the nature of the intrusion is particularly stark in the instant case because the warrantless entry was into a private residence. The Supreme Court has only recently reminded us that the primary abuse against which the Fourth Amendment was designed to protect was a warrantless intrusion into the home. *Payton v. N. Y.*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). *See also State v. Matsen*, 287 Or. 581, 601 P.2d 784 (1979).

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home . . . . "

*Payton v. N. Y., supra*, 100 S.Ct. at 1382–83.

The kind of necessity which would justify overcoming the warrant requirement and justifying an intrusion into a private home is absent here.

■ Exigent circumstances require more than a fear or apprehension that evidence

will be destroyed. Hindsight cannot be a substitute for prior knowledge of an agent that a defendant or his associate is really in a position to destroy evidence. No doubt there will be occasions when agent fears, based upon a suspicion or hunch, will be realized and evidence will be destroyed. But that is not sufficient reason to permit guesswork to be a substitute for knowledge beforehand of the peril of destruction of evidence.

Although the officers' fears may have been understandable, they do not rise to the level of emergency circumstances. The government has failed to justify the absence of a warrant at the time the agents "secured" Mrs. Levine's home. The evidence obtained must be suppressed as to defendant Levine. The question of whether the evidence should be suppressed as to the others will be decided in subsequent proceedings.

So ordered.