**UNITED STATES of America**

**v.**

**Mutulu SHAKUR, a/k/a "Doc," a/k/a "Jeral Wayne Williams," Sekou Odinga, a/k/a "Nathaniel Burns," a/k/a "Mgabasi," a/k/a "Mugubasi," a/k/a "Eddie Holmes," a/k/a "Lou," Cecil Ferguson, a/k/a "Mo," a/k/a "Chui," Edward Lawrence Joseph, a/k/a "Edward Lawrence," a/k/a "Jamal," a/k/a "Tony," a/k/a "J.R.," William Johnson, a/k/a "Bilal Sunni-Ali," a/k/a "Spirit," Silvia Baraldini, a/k/a "Louise," Susan Rosenberg, a/k/a "Elizabeth," Cheri Dalton, a/k/a "Nahanda," Iliana Robinson, a/k/a "Naomi," Nilse Cobeo, a/k/a "Nilse Lawrence," a/k/a "Ginger," a/k/a "Gigi," a/k/a "Giovanni Correa," and Alan Berkman, Defendants.**

No. SSS 82 Cr. 0312 (KTD).

United States District Court, S.D. New York.

March 29, 1983.

---

25. *See supra* section I(A)(1)(d).

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, for the Government; Robert S. Litt, Stacey J. Moritz, Asst. U.S. Attys., New York City, of counsel.

Susan Tipograph, New York City, for defendant Sylvia Baraldini.

## MEMORANDUM & ORDER

**KEVIN THOMAS DUFFY**, District Judge:

On the morning of November 9, 1982, Sylvia Baraldini was arrested on the street near her apartment pursuant to a federal complaint and warrant. At the time of her arrest, she was carrying and law enforcement personnel seized a blue cloth shoulder bag and a marroon shoulder bag both of which contained miscellaneous papers. Defendant Baraldini now moves to suppress these documents and their fruits for violations of the First and Fourth Amendments as well as the attorney-client privilege.

Based on the papers seized from the defendant, the government submitted an application for a search warrant. Members of the New York City Police Department Bank Robbery Task Force ("Task Force") were assigned at approximately 12:15 p.m. to guard the entrance of Ms. Baraldini's apartment at 200 West 95th Street until a warrant was issued. Judith Holmes, Esq., one of the defendant's attorneys, arrived at the apartment around 2:00 p.m. and was not permitted to enter.[1] Ms. Holmes spoke through the door to Margot Pelletier, a friend of Ms. Baraldini's who was inside the apartment, and told her of the presence of the police officers who were waiting for a warrant before entering. Approximately one hour later, the officers entered the apartment without a warrant. The police officers conducted an "extensive visual search" (Affidavit of Margot Pelletier at 2) of the apartment until close to 5:30 p.m. when the search warrant was signed by Magistrate Raby. From the time the search warrant was issued until 10:00 p.m. that evening, Federal Bureau of Investigation ("FBI") agents as well as Task Force officers searched Ms. Baraldini's apartment. The officers finally left the apartment carrying seven cartons. Ms. Holmes was then given a copy of the search warrant and a ten-page inventory.

Baraldini now moves to suppress all evidence seized from her apartment and the fruits thereof for the following reasons: (1) the warrantless entry was illegal; (2) there was no probable cause for issuance of the search warrant; (3) the warrant was unconstitutionally overbroad, and (4) the items seized were outside the scope of the search warrant.

## I. Search Incident to Arrest

■ Ms. Baraldini admits that at the time of her arrest she was carrying the miscellaneous papers seized by law enforcement. Affidavit of Susan V. Tipograph at ¶ 3. In the same breath she contends that

---

1. For purposes of this motion, I am accepting the defendant's affidavits as true. There are certain factual discrepancies between the defendant's affidavits and those of the govern-ment. These disputes are not material to resolution of the issues. Accordingly, I will accept the defendant's version and there is no need for a hearing.

the search of these files was not properly executed incident to her arrest. It is established beyond peradventure that the arresting officer has a right to search "the arrestee's person and the area 'within [her] immediate control'—construing that phrase to mean the area from within which [she] might gain possession of a weapon or destructible evidence." *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). This right has since been further refined to allow an officer to conduct a search incident to arrest regardless "whether or not there is probable cause to believe that the person arrested may have a weapon or is about to destroy evidence." *United States v. Chadwick,* 433 U.S. 1, 14, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977).

▪ Property within the immediate possession of the person arrested is properly subject to search. *United States v. Edwards,* 415 U.S. 800, 803, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771 (1974). The bags seized from Baraldini were within her immediate possession and thus were constitutionally searched by the police officers. *Cf. United States v. Edmonds,* 535 F.2d 714, 720 (2d Cir.1976), (search of suitcase); *United States v. Lam Muk Chiu,* 522 F.2d 330, 332 (2d Cir.1975) (search of attache case); *United States v. Venizelos,* 495 F.Supp. 1277, 1281 (S.D.N.Y.1980) (search of handbag).

▪ Baraldini alternatively argues that a search incident to arrest must take place contemporaneously with the arrest. This argument is effectively undermined by the Supreme Court's holding in *United States v. Edwards,* 415 U.S. at 803, 94 S.Ct. at 1237: "It is also plain that searches and seizures that could be made on the spot at the time of the arrest may legally be conducted later when the accused arrives at the place of detention." *See also United States v. Venizelos,* 495 F.Supp. at 1281. The officers processing Baraldini called Assistant United States Attorney ("AUSA") Robert S. Litt, one of the attorneys responsible for the prosecution of this case, and requested permission to search the defendant's bag. Affidavit of Robert S. Litt at ¶ 2. Litt autho-

rized the search after learning that Baraldini was carrying the bag when arrested. *Id.* This authorization was consistent with Supreme Court precedent and Baraldini's constitutional rights.

▪ Baraldini finally argues that the First Amendment renders the warrantless search illegal. The defendant was serving as a legal assistant to Susan V. Tipograph, Esq. at the time of her arrest. It is alleged that documents seized are protected by the attorney-client privilege. A bald assertion of this privilege does not operate to invalidate a legal search. Baraldini's reliance on *National City Trading Corp. v. United States,* 635 F.2d 1020 (2d Cir.1980) is unpersuasive. In *National City,* the Second Circuit upheld a search of a law office to obtain evidence of a client's criminal activity. Although cautioning against unnecessary intrusion on attorney-client communications, the court nevertheless allowed the search "if there is reasonable cause to believe that the specific items sought are located on the property to be searched." *Id.* at 1026.

Further validation for the instant search is found in Baraldini's failure ever to identify, although all the seized documents are available for inspecting the papers supposedly protected by the privilege. I cannot expect law enforcement to be able to scrutinize all papers seized for a potential attorney-client privilege when the person asserting the privilege fails to do so.

For all the above reasons, I uphold as constitutional the warrantless search of Ms. Baraldini's bags conducted incident to her arrest.

II. Warrantless Entry

Members of the Task Force entered Baraldini's apartment approximately one and one-half hours before the search warrant was issued. The defendant contends that the "exigent circumstances" exception approved in *Warden v. Hayden,* 387 U.S. 294, 298, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782 (1967), is inapplicable and therefore requests suppression of all property seized from the premises.

The Fourth Amendment prohibits a search of a private home without a warrant. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Limited exceptions to this general prohibition, however, have been fashioned when exigent circumstances make waiting for the issuance of a warrant impossible. *United States v. Martino,* 664 F.2d 860, 869 (2d Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). For example, the Second Circuit has held

> that where a lawful arrest was made on the street outside the defendant's apartment, and the officers had a legitimate basis for believing there were other persons inside the apartment who were likely to be aware of the arrest and therefore might destroy evidence in the apartment, a warrantless entry into and security check of the apartment was permissible.

*Id.; see United States v. Agapito,* 620 F.2d 324, 336 n. 18 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

It is undisputed that the Task Force entered Baraldini's apartment after Ms. Holmes arrived and spoke with Ms. Pelletier about the expected search warrant.[2] A reasonable belief existed that the third party, now identified as Ms. Pelletier, knew of Baraldini's arrest and the Task Force's attempt to secure a warrant and therefore might destroy evidence in the apartment before the warrant was issued. This belief validated the Task Force's entry into the apartment.

Baraldini's citation of *United States v. Levine,* 500 F.Supp. 777 (W.D.N.Y.1980) as support for a contrary conclusion is unavailing. In *Levine,* the court invalidated a warrantless entry where there was no reason to believe that the occupant of the home knew of the defendant's arrest. In the instant case, however, implicit in Ms. Holmes' conversation with Ms. Pelletier is the knowledge that Ms. Baraldini had been arrested.[3] Ms. Pelletier when confronted with the knowledge that Task Force members were outside the apartment door did not ask for an explanation of their presence nor did she question why a search warrant was being sought. Her silence on the issues implies that she knew, as in fact she did, of Baraldini's arrest.

Baraldini alternatively suggests that even if the warrantless entry was proper, the Task Force was not permitted to conduct an "extensive visual search" of her apartment. The defendant suggests that the appropriate remedy for this intrusion on her privacy rights is suppression of all evidence seized pursuant to a warrant. It is conceded that the Task Force only conducted a visual search before the warrant was issued. At that point, the officers were legally inside the apartment and permitted to search for additional third parties who might possibly destroy evidence. After finding only Ms. Pelletier, the Task Force lawfully secured the apartment by waiting inside until the warrant was issued. *United States v. Diaz,* 577 F.2d 821, 824 n. 3 (2d Cir.1978).

The question remains whether the "extensive visual search" invalidates the legal entry. Even assuming that the Task Force's visual search went beyond the "plain view" exception set forth in *Coolidge v. New Hampshire,* 403 U.S. 443, 464–72, 91 S.Ct. 2022, 2037–41, 29 L.Ed.2d 564 (1971), the subsequent issuance of a valid search warrant allows the admissibility of evidence seized pursuant to that warrant thereby nullifying the effect and the remedy of an illegal entry. *See United States v. Agapito,* 620 F.2d at 338.

---

**2.** The government's papers do not state whether the Task Force knew Ms. Pelletier or any other person was inside the apartment before Ms. Holmes' arrival. This unknown fact, however, is not material to the determination herein. Even if the Task Force knew a third party was inside the apartment, the entry did not take place until after Ms. Holmes told Ms. Pelletier of the attempt to obtain a search warrant.

**3.** Ms. Pelletier states that she learned of the defendant's arrest at around noon on November 9, 1981. Affidavit of Margot Pelletier at ¶ 2. It is unknown whether the Task Force was aware of the extent of her knowledge at the time of their entry.

For the above reasons, Baraldini's motion to suppress evidence based on an illegal entry into her apartment is denied.

### III. Search of Apartment

Ms. Baraldini next argues that the search of her apartment was unconstitutional for the following reasons: (1) there was no probable cause to support the issuance of the search warrant; (2) the warrant was a prohibited general warrant and, (3) items seized from the apartment were outside the strictures of the warrant.

#### A. *Probable Cause*

A search warrant is issued consistent with the Fourth Amendment

> when the facts are sufficient to satisfy a reasonably prudent detached and neutral person that a crime is being committed or evidence of it [is] kept on the premises to be searched and that the informant's information has been obtained by him in a reasonably reliable way rather than through neighborhood gossip, conjecture, or mere suspicion.

*United States v. Agapito,* 477 F.Supp. 706, 716 (S.D.N.Y.1979), *aff'd,* 620 F.2d 324 (2d Cir.1980). In reviewing the probable cause basis of the search warrant in question, I am mindful of the deference to be paid to Magistrate Raby's decision that probable cause existed to issue the warrant. *United States v. Perry,* 643 F.2d 38, 50 (2d Cir. 1981), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1982). I am also mindful of my obligation to read the affidavit as a whole and "in a common sense and realistic fashion." *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); *United States v. Jackstadt,* 617 F.2d 12, 14 (2d Cir.), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980).

The search warrant was based on the Affidavit of Robert J. Cordier, a special agent of the FBI presently assigned to the Joint FBI-Task Force. Incorporated into the affidavit is the criminal complaint issued against the defendant. The affidavit states that Sylvia Baraldini is a known member of the May 19th Communist Organization ("May 19") who resides at 200 West 95th Street. The affidavit states that the May 19 group, according to Special FBI agent William Reagan, who infiltrated the Weather Underground Organization ("WUO") for eight years, is aligned in the criminal activity under investigation with the WUO, the Black Panther Party, the Black Liberation Army, the Provisional Government of the Republic of New Afrika, the New Afrikan Women's Organization, the Prairie Fire Organizing Committee and possibly other groups. Affidavit of Robert J. Cordier at ¶ 6(a). Reagan's conclusion was based on his undercover experience with the WUO, his review of documents seized from various "safe houses" and residences and a review of the known criminal activity to date. *Id.* at ¶ 6. Reagan's conclusion as to the propensity for violence of these aligned groups is supported by weapons, ammunition and bomb paraphernalia seized from various apartments linked to the groups since the October 20, 1981 incident. *Id.* at ¶ 6(b), 7.

The affidavit then describes various documents seized from the bags Ms. Baraldini was carrying at the time of her arrest:

> (a) A handwritten document with a list of questions concerning security arrangements for the defendants in the Rockland County case, which appear to me to relate to a proposed escape attempt;
>
> (b) A handwritten document, dated October 26, 1982, describing the October 20th robbery and the writer's participation therein;
>
> (c) Other documents indicating an association among various radical groups including the May 19th Communist Organization, RNA, WUO and relating to past and planned violent crimes to be committed by members of those groups.

*Id.* at ¶ 8.

The complaint, also sworn to by Agent Cordier and appended to the Cordier affidavit, further connected Baraldini to the October 20th incident on the basis of FBI investigation and CS 1 (a confidential informant). It states that the defendant con-

ducted reconnaissance of a shopping center in Rockland County, New York during the summer before the Nanuet armed robbery. The complaint further relies on the information gleaned from CS 1, who was later identified as Samuel Brown. Brown was arrested "attempting to flee from the site of the Nyack roadblock and shootings." Complaint at ¶ 4. Brown told Cordier that Baraldini participated in meetings where plans for both the Nanuet robbery and past robberies were discussed. *Id.* at ¶ 11. Brown further stated that the defendant was to drive the getaway car in two unsuccessful robberies. *Id.* at ¶¶ 14, 16. The complaint also states that Baraldini's fingerprints were found (1) in a New Jersey apartment where the FBI and police seized bomb paraphernalia as well as maps of various New York City Police Department precinct houses, (2) in a Bronx apartment of a woman who told the FBI she was the girlfriend of Nathaniel Burns, a/k/a Sekou Odinga, a defendant herein, and (3) on items seized from the beige Honda used as a getaway car from the Nanuet robbery. *Id.* at ¶ 19.

On the basis of the above described affidavit and complaint, Magistrate Raby concluded that there was probable cause to believe the following evidence would be found in Baraldini's apartment:

Clothing, wigs, weapons, explosives or explosives paraphernalia, ammunition, car rental agreements relating to cars used in armed robberies of armored trucks; and Books, records and documents or other papers relating to:

—Production, use or deployment of bombs, explosives, incendiary devices or other weapons;

—The whereabouts, plans or meetings of members of organizations such as the Weather Underground, the May 19th Communist Organization, or the Black Liberation Army ("BLA");

—Armored car robberies including that occurring on October 20, 1981; and

—Other documents or evidence relating to or evidencing crimes committed by the Weather Underground, the May 19th Communist Organization, or the BLA

All of which are fruits and instrumentalities of violations of Title 18, United States Code, Section 2113, and conspiracy to violate that section, Title 18, United States Code, Section 371.

■ The affidavit and complaint, when read as a whole, place Baraldini at meetings where the October 20th robbery and past robberies were discussed and at various reconnaissance missions for the Nanuet and other unsuccessful robberies. The October 20th robbery is attributed to a coalition of many organizations including May 19, of which the defendant is an admitted member. It was reasonably inferred from this evidence that the information sought in the search warrant would be found in Baraldini's apartment. *Cf. United States v. Jackstadt,* 617 F.2d at 14 ("The Magistrate was entitled to make reasonable inferences from the facts stated in the affidavit.").

■ Ms. Baraldini then challenges the source of the information providing the probable cause foundation for the warrant. First, she claims that the reckless disregard for the truth evidenced in the Cordier Affidavit requires a hearing under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1977) to determine the veracity of the FBI agent's allegation that the May 19 group "is known to the FBI from prior investigation to commit and have committed acts of violence and to espouse and have espoused the use of violence." Affidavit of Robert J. Cordier at ¶ 3. This allegation is not supported in the affidavit with underlying facts. A hearing, however, is only required when the one challenging the affidavit makes an offer of proof as to the affiant's deliberate falsehood or reckless disregard for the truth. *Franks v. Delaware,* 438 U.S. at 171–72, 98 S.Ct. at 2684–85. No such offer of proof has been made. Furthermore, after removing the challenged paragraph from the Cordier affidavit, sufficient facts to support issuance of the warrant remain.

Second, Baraldini argues that the information supplied by Agent Reagan was

stale. The affidavit admits that Reagan's undercover investigation lasted from approximately 1970 through late 1977 or early 1978. Reagan's information and conclusions are not based solely on his tenure with the WUO. He also examined current FBI files. His background is valuable to the interpretation of documents recently seized. Furthermore, many of Reagan's conclusions, i.e. the use of safe houses, were corroborated by Samuel Brown.

Third, the defendant challenges Reagan's conclusions as violative of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1963). She correctly argues that a search warrant must be based on more than suspicion, a belief or mere conclusions and that the underlying circumstances of an informant's information must be revealed. *Id.* at 114, 84 S.Ct. at 1514. This standard, however, is not applied to each paragraph in the Cordier affidavit, but rather to the affidavit as a whole. It is not required that Reagan detail his undercover activity with the WUO. The affidavit, when read in its entirety, presents facts compiled from FBI investigations, Brown, Reagan, and documents seized from the defendant sufficient for a finding of probable cause. Furthermore, Baraldini ignores the fact that Reagan's conclusions were based on the information learned while a member of the WUO *and* his review of the FBI current investigatory file. His conclusion, for example, that the instant criminal activity combines many groups is corroborated by documents seized from the defendant. Reagan's conclusions thus rise above suspicion and satisfy the *Aguilar* standard.

Fourth, Baraldini attacks the probable cause foundation of the search warrant by attacking the illegality of the searches mentioned in the Cordier Affidavit. The defendant, however, has no standing to contest the legality of either the East Orange, New Jersey or the Bronx, New York safe houses and cannot move for suppression of any of the evidence seized therein. *Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1969); *United States v. Tortorello,* 533 F.2d 809, 814 (2d Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976).

Baraldini's final argument suggests that the government's failure to disclose the identity of CS 1 invalidated the probable cause foundation. A confidential informant need only be disclosed "where the information supplied by such persons constitutes the 'essence,' 'core' or 'main bulk' of the probable cause upon which the authorities have relied, and where the critical information ascribed to the individuals is not in any significant manner corroborated by independent evidence." *United States v. Manley,* 632 F.2d 978, 985 (2d Cir.1980), *cert. denied sub nom. Williams v. United States,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). The information supplied by Brown, although relevant to the probable cause determination, did not supply the main bulk of evidence against Baraldini. Documents seized from her person, results of FBI investigations and Reagan's information all combined with the data supplied by Brown to provide the requisite probable cause. Accordingly, the identity of CS 1 did not have to be disclosed in the warrant affidavit.

Baraldini's attempts to undermine the probable cause foundation of the search warrant are unavailing. The information supplied to Magistrate Raby justified the issuance of the search warrant.

### B. *General Search Warrant*

General search warrants that allow an unabashed rummaging of a person's property are proscribed by the Fourth Amendment. *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). In order to overcome this constitutional limitation, the warrant must contain a "particular description" of the items to be seized. *Id.* The rider attached to the search warrant, reproduced in full above at 14–15, specified the items to be seized in connection with the crimes of bank robbery and conspiracy.

It would be unreasonable to expect the government to list the exact documents

it sought; rather, a generic description of the class of items sought is sufficient. *United States v. Scharfman*, 448 F.2d 1352, 1355 (2d Cir.1971), *cert. denied*, 405 U.S. 919, 92 S.Ct. 944, 30 L.Ed.2d 789 (1972). The government did not know what documents actually would be present in Baraldini's apartment, but to prevent the fishing expedition prohibited by *Coolidge* it listed the class of items sought that were directly connected to the search warrant.

■ Baraldini argues that because the rider permitted the seizure of documents espousing political beliefs, the warrant ran afoul of the First Amendment. I disagree. All documents fitting within the description in the rider were properly seized. In *Zurcher v. Stanford Daily*, 436 U.S. 547, 554, 98 S.Ct. 1970, 1975, 56 L.Ed.2d 525 (1978), the Supreme Court concluded that consistent with the First Amendment, "valid warrants may be issued to search *any* property, whether or not occupied by a third party, at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found." *National City Trading Corp. v. United States*, 635 F.2d at 1025. The papers were not seized for their political content or their expression of ideas but instead for their connection to specifically enumerated criminal activities. The rider's specifications limited the intrusion that necessarily results during execution of a search warrant. *See Andresen v. Maryland*, 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n. 11, 49 L.Ed.2d 627 (1976).

Accordingly, the warrant is specifically particularized to pass constitutional muster.

### C. *Scope of Warrant*

In her final request for suppression of evidence seized, Baraldini argues that the seizure of irrelevant items beyond the search warrant's scope demonstrates the overly broad nature of the warrant. For example, bank accounts and records of Ms. Baraldini's mother, class rosters of Ms. Baraldini's roommate and other irrelevant papers were seized. Arguably, these items had some potential significance in locating either financial arrangements or partici-

pants in the charged criminal activity. For example, it was not known whether the bank accounts were under an alias of the defendant. Once it was determined, however, that these items had no evidentiary value, they were returned.

■ If, in fact, documents outside the warrant were seized, Baraldini's remedy is suppression of the wrongfully seized items. *National City Trading Corp. v. United States*, 635 F.2d at 1026. The defendant has not, however, gone through the miscellaneous documents and identified the wrongfully seized items. Papers at first blush may appear to the officers executing the warrant to be included within the rider's terms. This does not imply, as the defendant suggests, that law enforcement personnel were conducting an "investigatory dragnet" to seize papers protected by the First Amendment. For these reasons, defendant's request for invalidation of the search warrant is denied.

In sum, Baraldini's motions for suppression of documents seized from her person incident to her arrest and from her apartment pursuant to a valid search warrant are denied.

SO ORDERED.

### ON REQUEST TO HIRE JURY SELECTION EXPERT

■ The defendant Cecil Ferguson through his court appointed counsel has requested permission to hire with CJA funds, Jay Schulman, a so-called jury selection expert.

There is absolutely no persuasive evidence that I know of or that has been brought to my attention which indicates that the use of such a jury selection "expert" is of any efficacy whatsoever. It appears to me not only from my own experience, but from what I have been able to learn from other judges and from practicing attorneys, who have hired such so-called "experts," that all that is added is another guess by another person to the "hunch" of the lawyer who ultimately makes the decision whether or not to challenge a particu-

lar venireman. The record of such "hunches" has yet to insure any practitioner with a winning day in court. Indeed, it is my impression after observing the process for over ten years as a judge that many practitioners might do better trying their hunches at the track. A jury selection expert is no more necessary than a tout at the race track.

The expense proposed is far from being either appropriate or necessary and will not be paid out of CJA funds.

The application is denied.

SO ORDERED.