UNITED STATES of America

v.

**Federico GIOVANELLI, a/k/a "Fritzy," Steven Maltese and Carmine Gualtiere, a/k/a "Buddy," Defendants.**

**No. S 88 Cr. 954 (CBM).**

United States District Court, S.D. New York.

June 7, 1989.

See also, 747 F.Supp. 875.

Benito Romano, U.S. Atty. S.D.N.Y. by Adam S. Hoffinger, J. Gilmore Childers, Asst. U.S. Attys., New York City, for U.S.

Lawrence Hochheiser, Hochheiser & Aronson by Vivian Shevitz, Georgia J. Hinde, New York City, for defendant Federico Giovanelli.

Ira S. Cooper, Zerin & Cooper by Neil Rothfeld, New York City, for defendant Steven Maltese.

Robert M. Baum, The Legal Aid Soc., Federal Defenders Services Unit by Roland Thau, Robert E. Precht, New York City, for defendant Carmine Gualtiere.

## OPINION

MOTLEY, District Judge.

Defendant Federico Giovanelli's home, located at 63–62 75th Street, Middle Village, New York, was searched on December 5, 1986 pursuant to a warrant issued by the Honorable Allyne Ross, United States Magistrate for the Eastern District of New York. Defendants attack the validity of the search on the following grounds: lack of probable cause upon which to issue the warrant, overbreadth and lack of particularity on the face of the warrant, and expiration of the warrant itself, making a search undertaken after the warrant had expired an illegal one.

Defendants move to suppress the fruits of the search of the house. In particular, defendants also move to suppress the fruits of the searches of five safe deposit boxes, keys to which were found by the Government in defendant Giovanelli's home during the December 5, 1986 search. Defendants claim that the Government's use of a forthwith grand jury subpoena, rather than a warrant as required, to open the safe deposit boxes, was improper and illegal and therefore, the contents of such boxes should also be suppressed as fruits of an illegal search. On May 8, 1989, the court held a hearing to examine the alleged illegalities surrounding the search and seizure of contents from defendant Giovanelli's home and from safe deposit boxes held in his name.

For reasons set forth below, defendants' motion to suppress the fruits of the search is denied.

## PROBABLE CAUSE FOR THE WARRANT

■ Giovanelli moves to suppress the fruits of a search of his residence on the grounds that the warrant authorizing that search was not supported by an affidavit establishing probable cause to believe that evidence of illegal gambling activity could be found at his home. Specifically, Giovanelli states that since he was incarcerated at the time of the search, there was no basis for believing that the items described in the search warrant—evidence of illegal gambling activity—could be found at his residence.

It is well settled that "[t]o establish probable cause to search a residence, two factual showings are necessary. First, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983). Probable cause is "a practical, non-technical conception," *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), requiring only that "there be a fair probability that the premises will yield the objects specified in the search warrant." *United States v. Travisano, supra,* 724 F.2d at 346. Such a showing is not to be equated with "a *prima facie* showing of criminal activity," *United States v. Nersesian,* 824 F.2d 1294, 1306 (2d Cir.1987), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987), and "need not be based on direct first hand or 'hard' evidence." *United States v. Thomas,* 757 F.2d 1359, 1367 (2d Cir.1985), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985). Moreover, a magistrate's finding of probable cause is entitled to substantial deference by a reviewing court. *United States v. Travisano, supra,* 724 F.2d at 345 (citing cases). In fact, "the magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of the warrant.... This is particularly true in close cases, where doubts should be re-

solved in favor of upholding the warrant." *Id.* (citing cases).

Reviewing the affidavit of FBI Agent Walls, Magistrate Ross was clearly in a position to determine that evidence of illegal gambling activity could be found at Giovanelli's residence. Agent Walls described the common practices of those who run illegal gambling enterprises, including the use of "pick-up men" to pass "policy" or "numbers" slips from gambling "spots" to the enterprise's "policy banks." *See* Affidavit of Special Agent Juanita Walls at 2–6. She further stated that FBI agents had learned from reliable informants that, during his incarceration, Giovanelli continued to run the gambling enterprise from his jail cell. *Id.* at 7. According to Agent Walls, two of Giovanelli's associates, Joseph Rizzo and Benny LaRussa, reported directly to Giovanelli in matters concerning the gambling operation. *Id.* at 8.

The Walls affidavit goes on to detail numerous incidents suggesting that Giovanelli's home continued to be a center of defendant's alleged gambling operation. On October 3, 1986, Rizzo was observed entering the Giovanelli residence with a brown accordion folder. He emerged ten minutes later, empty-handed. *Id.* at 20–21. On June 20, 1986, LaRussa was observed exiting the Giovanelli home after having been at a known gambling establishment. *Id.* at 38. LaRussa visited the Giovanelli home again on July 25, 1986. *Id.* On August 29, 1986, LaRussa was again observed at the Giovanelli residence, where agents saw him emerge from the house, remove a manila envelope from under the driver's seat of his car, and reenter the house. He left the house a minute later. *Id.* at 38–39. In addition, Carol Giovanelli, defendant's wife, was observed accepting an envelope from LaRussa after they and Rizzo visited Giovanelli in prison at Rikers Island. The exchange of that envelope occurred directly outside the Giovanelli residence. *Id.* at 40.

In light of the affidavit's numerous descriptions concerning the use and exchange of envelopes and folders to transport the paperwork involved in gambling operations, Magistrate Ross had ample probable cause to issue a warrant for the search of Giovanelli's residence. The Walls affidavit contains much information from confidential sources concerning an ongoing gambling enterprise which Giovanelli allegedly directed from his prison cell. As the affidavit states, LaRussa and Rizzo effectively assumed responsibility for running the enterprise while Giovanelli himself was in jail. *Id.* at 16–17. Thus, each of the incidents described in the affidavit may reasonably be seen as part of a pattern of ongoing gambling activity constituting probable cause to believe that evidence of such activity could be found at Giovanelli's home. In light of observations of LaRussa and Rizzo dropping off envelopes at the Giovanelli residence, as well as Agent Wall's description of the common gambler's practice of storing policy slips and money in their own homes, *id.* at 6, Magistrate Ross's finding of probable cause for the search warrant, entitled to substantial deference by this court, *United States v. Travisano, supra,* 724 F.2d at 345, must be upheld.

## SPECIFICITY OF THE WARRANT

■ Giovanelli claims that the search warrant for his residence was defective in that it was overbroad and not sufficiently particularized. Specifically, Giovanelli objects to that portion of the warrant authorizing the seizure of "[p]apers, pencils, carbon paper, envelopes, rubber bands, *etc.*" (emphasis added). Defendant claims the use of the term "etc." renders the warrant overly general and thus defective, mandating suppression of all the evidence seized from his residence.

■ While it is well-established that the Fourth Amendment requirement of particularity makes general searches impermissible and "prevents the seizure of one thing under a warrant describing another," *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927); *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 512, 13 L.Ed.2d 431 (1965); *Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976), the fact that an item seized is not specifically set forth in a search warrant does not

necessarily invalidate its seizure. *See United States v. Scharfman,* 448 F.2d 1352, 1354–55 (2d Cir.1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 944, 30 L.Ed.2d 789 (1972). Recognizing the difficulty of setting forth in a warrant an exact description of each and every item to be seized, the Second Circuit has concluded that "when First Amendment rights are not involved, the specificity requirement is more flexible." *United States v. Scharfman, supra,* 448 F.2d at 1354. Thus, the use of generic descriptions of classes of items to be seized is permissible when First Amendment rights are not involved. *Id.* at 1354–55. *See also United States v. Shakur,* 560 F.Supp. 337, 345–46 (S.D.N.Y.1983) (since it would be unreasonable to expect the government to list the exact documents it sought, use of "other documents or evidence" in search warrant is permissible); *United States v. Rubio,* 526 F.Supp. 171, 175–77 (S.D.N.Y.1981) (use of words "other records, documents and papers" in search warrant is permissible when more exact descriptions are impossible and when words are sufficiently specific in light of their common sense meaning and general knowledge of those conducting search). Accordingly, the use of the words "etc." in the warrant authorizing the search of Giovanelli's home does not render it defective as insufficiently particularized and does not mandate suppression of the evidence seized in that search.[1]

## GOVERNMENT'S TREATMENT OF GIOVANELLI'S RED NOTEBOOK

■ During the search of Giovanelli's residence, a red notebook was seized pursuant to the warrant. Shortly thereafter Giovanelli's attorney wrote the Government and demanded that the notebook be immediately sealed and returned to Giovanelli on the grounds that it contained communications allegedly protected by defendant's attorney-client privilege. Since the

government refused to comply with Giovanelli's request, defendant now argues that all the evidence seized in the search of his home should be suppressed.

The red notebook was validly seized pursuant to that portion of the search warrant authorizing seizure of "[l]ists and/or address book reflecting telephone numbers of individuals involved in or with the policy operation." Defendant does not dispute the Government's contention that, among other writings, the notebook contains names and telephone numbers of Giovanelli's alleged associates and co-conspirators in the illegal gambling enterprise charged as an offense in this case. If the notebook does contain other statements alleged to be within the scope of Giovanelli's attorney-client privilege, and if the Government seeks to introduce those statements at trial, the court will determine at the proper time whether those statements may be correctly received in evidence.

## SUPPRESSION OF CONTENTS OF SAFE DEPOSIT BOXES

Defendants move to suppress the fruits of searches of five safe deposit boxes, four of which were undertaken on December 5, 1986 and one of which was undertaken on December 9, 1986. Defendants rely on two theories to support this motion: 1) that the searches of the boxes were the direct fruits of an illegal search conducted pursuant to a warrant that had expired; 2) that the December 5, 1986 search of the four boxes undertaken pursuant to a forthwith grand jury subpoena was improper and any attempt by the Government to cure such impropriety through retroactive application to retain the cash was wholly ineffective. Although a search warrant was obtained for the December 9, 1986 search of the fifth box, defendants argue that currency seized from that box should also be suppressed because it was the direct fruit of the December 5, 1986 search of the Giovanelli residence, a search which defendants

---

1. Even if the items seized from the Giovanelli residence had not been sufficiently described in the search warrant, the remedy would not be suppression of all the evidence obtained in the search, but rather exclusion of the specific item claimed to be improperly seized. *National City*

*Trading, Corp. v. United States,* 635 F.2d 1020, 1026 (2d Cir.1980). Giovanelli, however, has failed to specifically identify even one item seized which he claims to have been insufficiently described in the warrant.

charge was illegally conducted because the warrant authorizing it had expired.

### A. Alleged Expiration of Search Warrant

From the hearing held by the court on May 8, 1989, it is clear that the search warrant had not expired by the time the search of the Giovanelli residence was conducted on December 5, 1986. The confusion as to the expiration date of the warrant arose because the copy of the warrant produced by the Government to defense counsel was not the actual warrant relied upon by the Government for its December 5, 1986 search, as that warrant was still unsealed during the discovery stage of the case. But as the Government's witness, Anne Vitale, Assistant United States Attorney in the Southern District of New York and deputy chief of the narcotics unit explained, upon the Government's request, the original date by which the search of Mr. Giovanelli's home was to be conducted, November 30, 1986, was subsequently extended until December 5, 1986 by Magistrate Ross. *See 5/8/1989 Transcript* at 5. The original date of November 30 was crossed off, the new date of December 5 was added and Magistrate Ross initialed the change. *Id.* at 6. The search of Mr. Giovanelli's home on December 5, 1986 was therefore valid and items seized by the Government during the course of the search cannot be suppressed as poisonous fruits.

### B. The December 5, 1986 Search of the Four Safe Deposit Boxes

Keys to safe deposit boxes were found by the Government during its search of Mr. Giovanelli's home on December 5, 1986. To prevent removal of their contents while the Government found out whether or not the boxes were still registered to the Giovanellis and while it applied for a search warrant for the boxes, a subpoena was issued to freeze the contents and records of the four boxes numbered as 552, 553, 560 and 561. *Id.* at 7–8. The Government had no intention of obtaining the contents of the four safe deposit boxes through the use of that subpoena but instead intended only

to preserve them. *Id.* at 9. The subpoena therefore was not due to be returned on December 5, the date it was issued, but rather on December 8, at which time the contents of the deposit boxes were to be produced. *Id.* Moreover, the subpoena did not contain a statement normally included on subpoenas in cases in which the Government wishes the production of documents to occur before the return date, a statement to the effect that production of the requested material on or before the return date shall be deemed compliance with the subpoena. *Id.* at 10–11. The production of the contents by Mr. Ira Bailey, the president of Cross County Federal Savings Bank, to the Government agent serving the subpoena was clearly an unanticipated occurrence. Contrary to defendants' claim that it was improper "for agents to *seek to obviate* the warrant requirement" *Memorandum of Defendant Federico Giovanelli In Support of Omnibus Motion for Pretrial Relief,* at 102 (emphasis added), the court cannot say that the Government acted in wilful disregard of what it believed the proper procedure to be, or that it acted in bad faith in this respect. As stated above, Anne Vitale testified that the sole purpose of the subpoena was to freeze the contents of the boxes while the Government attempted to obtain a search warrant for them, *5/8/1989 Transcript,* at 8–10, that the removal and production of the contents by Mr. Bailey to the agents was not anticipated, *id.* at 24 and, in fact, that the particular turn of events as occurred in this incident had never before occurred in the Southern District. *Id.* at 24–25.

Moreover, while the receipt of currency from boxes 560 and 561 by Government agents on December 5, 1986 was indeed premature, the currency found from those boxes is admissible under the "inevitable discovery" doctrine which provides an exception to the exclusionary rule under certain circumstances. Under *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984), evidence which would otherwise be excluded can be admitted "[i]f the prosecution can establish by a preponderance of the evidence that the in-

formation ultimately or inevitably would have been discovered by lawful means." The "inevitable discovery" doctrine, together with the exclusionary rule, provides that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are balanced by putting the police in the same, not a *worse*, position than they would have been in if no police error or misconduct had occurred." *Id.* at 443, 104 S.Ct. at 2509 (emphasis in original) (footnote omitted).

From the facts elicited during the May 8, 1989 hearing, the court finds that the requirement of the exception, that the currency would have been discovered by lawful means, was met. Defendants, however, claim that the "inevitable discovery" doctrine is applicable only in cases in which "agents were in the process of obtaining search warrants prior to and at the very moment of the illegal search and seizure...." *Defendants' May 5, 1989 letter* at 2. In other words, defendants argue that "in the cases concerning the inevitable discovery doctrine, some legal process had already been in place in every case cited," *5/8/1989 Transcript*, at 176, before the inevitable discovery doctrine had been invoked. Thus, according to defendants, since the Government was not in the process of applying for a warrant before or during the Government's receipt of the currency from the bank president, no legal process had been initiated, hence the "inevitable discovery" doctrine is inapplicable to the facts of this case. *See e.g., United States v. Whitehorn*, 829 F.2d 1225, 1231 (2d Cir.1987), cert. denied, 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988) (evidence would have been inevitably discovered because "[a]gents at the F.B.I. office actually began the warrant application process over an hour before the illegal" search occurred). However, the reason why no Government agent was in the process of applying for a search warrant for the boxes while the subpoena was being served on the bank was because the Government never expected to receive the boxes' contents with that particular subpoena to begin with. Thus, defendants' claim that the application of the "inevitable discovery" rule would be inappropriate in this case because no legal process had been invoked by the Government "prior to and at the very moment of the illegal search and seizure, *Defendants' May 5, 1989 letter*, at 2, makes no sense precisely because the Government never anticipated its service of the subpoena on the bank to become an "illegal search and seizure."

The Government only intended to safeguard potential evidence by freezing the contents of the boxes when its agents were dispatched to serve the bank with the subpoena. Contrary to defendants' claim, the Government was not employing a " 'shortcut" to circumvent its duty. *Defendants' May 5, 1989 letter*, at 3. Defendants' contention that had the Government really intended to "lawfully search the safe deposit boxes ..., warrant applications would have been made immediately after safe deposit box keys were found" is a contention unsupported by the facts. Testimony from the hearing reveals that the subpoena was employed only to freeze the contents of the boxes *so that* the Government could then proceed to apply for a search warrant. The subpoena was not used by the Government as an end in itself, but only as a means to prevent the boxes from being tampered with before the Government had a chance to apply for the warrant. If warrant applications for the boxes were made immediately upon discovery of the keys without ensuring first that the contents of such boxes were protected from removal or destruction, the warrant allowing the Government to seize the contents of the boxes would be of no use to it if the contents had been removed by the time the Government gets to opening the boxes. The Government's use of the subpoena as a temporary measure to safeguard the contents of the boxes is therefore proper for the purpose of ensuring that certain particular items will be secured before a search warrant can be obtained. *5/8/1989 Transcript*, at 157. Defendants now object to the use of the grand jury subpoena because it deprived "Mrs. Giovanelli [from going] to

the box, as she may well have, in order to get the money out...." *Id.* at 149.

Precisely because "it was probably inevitable that someone would have taken the money out of the box" if the Government had not acted to secure it, as defendants themselves admit, *id.* at 174, that the Government had to act to freeze the boxes' contents in the first place. There is no doubt that the Government would have inevitably discovered the cash in the boxes had it lawfully searched the box with the lawful search warrant that it had intended to apply for all along had the unexpected receipt of the cash not occurred. In fact, this is what happened with the fifth safety deposit box, box 701. Defendants' attempt to prevent the application of the "inevitable discovery" doctrine to this case is wrongfully based on the presupposition that the Government never intended to apply for search warrants for the boxes. Hence, defendants argue that the Government must prove that it was "inevitable that such [a legal] search would be conducted" before the Government is allowed to invoke the "inevitable discovery" doctrine. Defendants assume that because search warrants were not immediately procured on the instant in which the keys were discovered, the Government never intended to conduct a lawful search but rather only intended to employ a " 'shortcut' " as a substitute for the proper course of conduct. *Defendants' May 5, 1989 letter*, at 3. As discussed above, this is not the case, and had the unexpected intervening event not occurred, the lawful search of the boxes through a lawful search warrant would have been inevitably conducted, *id.*, and the currency from the boxes would have then been inevitably discovered.

CONCLUSION

For reasons discussed above, the court finds that the contents of boxes 560 and 561 are admissible under the "inevitable discovery" doctrine. Because the search warrant authorizing the search of defendant Giovanelli's home had not expired by the time the search was actually conducted and because the warrant was amply supported by probable cause and was not over-

ly broad, the search was not illegal and items seized pursuant to the search are not illegal fruits. Defendants' motion for suppression is denied.